Council for Jewish Elderly v. the State of Frank Kurtz Council for Jewish Elderly v. the State of Frank Council for Jewish Elderly v. the State of Frank Council for Jewish Elderly v. the State of Frank Frank Kurtz was a patient in Lieberman, it's a nursing home, and he developed a disease and then he eventually passed away. And he went into Lieberman in September 2013 and stayed there until June 23, 2018. The issue in this case is really Lieberman's claim that he should have received payments from Frank's estate and his widow who was sitting there for the care, for the nursing care they provided to Frank and for which they did not receive payment from Medicaid. Okay, so they didn't receive payment from Medicaid because originally they were paying, right? Yes, yes. Patient? Yes. What happened was there is a, there is various, various situations concerning that. If I could just give you a quick recap. When at first Frank came into the nursing home from September 2023 to November 30, 2023, the care was paid for by Blue Shoes Blue Cross. Then from December 1, 2013 to March 31, 2014, Medicare and Mutual Roma. And then April 1, 2014, October 31, 2014, the Kurtz's paid personally $67,158. And then, then there were the crux of the case. From November 1, 2014 to June 23, 2018, that's the period for which Medicaid should have paid. Okay, and what was that period again? What was that period? Sure, November 1, 2014 and June 23, 2018. And did Medicaid cut a check to Lieberman at any time during that period? Not during the period, almost four years later. For that period? For partial, partial payment for that period. And the reason they did, they paid only partially is because the application for, for the Medicaid payment was submitted late by Lieberman. And who, who was, so Medicaid is calling it a partial payment? Yes. Well, they called it a payment. They're calling it a partial payment. Yes. From Lieberman's standpoint, it's a partial payment. From, from our standpoint, that should have been the payment in full. Because when you apply for a payment for, for Medicaid and you receive the payment for, for the relevant period, that payment is in full. And you cannot go to the patient and say, pay me the rest. And then with Medicaid, though, Medicaid, I'm still a little confused. Is Medicaid saying that that's all they were going to pay for that period? And to, from their perspective, that's the full payment for that period? Yes. Because they, there is no such thing as balance bill. And that's the feature of Medicaid law. That if you, it's basically a tradeoff. If you are a private, if you are a provider, you provide services to a Medicaid patient. You have an agreement with the state. The state will pay you at the state rate, the Medicaid rate. In return, you, you don't have to pursue the private patient. Well, you can't pursue the private patient. You cannot. Because that defeats the whole purpose of, of the Medicaid law. And that's the problem with this case, is that the trial judge looked at this case as if it were a commercial insurance. Basically, it's saying what, if there's a shortfall in what insurance paid, you, the patient, are responsible for the shortfall. Did anyone raise the Lewis case with the trial judge, which seems to be the proposition you're citing about the balance billing. Yes, we, we've cited it from day one. Also, if I may go back to the history of the case. Okay. I'm, so far as the trial, the trial level, I came into the picture in March of 2022, after the motion for summary judgment was granted. And for the most of that time, and that is from the time the lawsuit was filed in September of 2016, the widow handled the case first thing. So did you handle the motion to reconsider after the motion for summary judgment was granted? No, I did not. You did not? I did not. I came in after the motion for reconsideration was already denied. Denied. Okay. And the motion to reconsider was denied. And denied. Okay. So I have a question. You, I mentioned earlier that the payment was late for Medicaid because the submission was late. Now, whose responsibility is that to make that submission? Lieberman. Lieberman. Lieberman, Lieberman holds itself up as, as a matter of fact, it's in the name that they are Medicaid specialists. And they did make, they did finally submit the application, but they did not submit the application until April of 2017. And because he, Frank, was qualified as a Medicaid patient in 2014, they should have submitted the application in the early part of 2015. Now, what that would allow them to do is get in a queue, so to speak. They would just make a, get a spot, get a reservation. And then when the final issues were resolved concerning the spend out and the penalty, then the Medicaid would have paid them for all the days that they were covered under the Medicaid law. Now, I know that this was before you came on, but it appears that your client attempted to bring DHS into the case early on in the proceedings. But what happened there? I'm sorry, I can't hear the question. I said, okay, so your client early on tried to get the Department of Health and Services involved in the case. But it doesn't, the record doesn't seem to indicate what happened there. What happened? Your Honor, what really happened was that when the issues were resolved, the penalty was eliminated. Okay. Judge Hall ruled that the penalty, the $27,000 penalty that the department imposed was unreasonable and then negated that penalty. Okay. I'm sorry, because I think, and maybe I misunderstood the question, but your client attempted to get the Department of Human Services and HFS. And I thought the court disallowed it. We just want to know why the court wouldn't have allowed them to be brought in as a. I can't answer that. Okay. The claim was brought by Lieberman against the Franks. Now, from day one, the defendant argued that this was a Medicaid case. And as a matter of fact, she filed a motion to have the Medicaid contract between Lieberman and the state of Illinois attached to the claim so that the court could actually consider the matter. So do you view this as a question of fact or a question of law, whether Frank's stay was covered by Medicaid? There is only one legal issue, and that legal issue is about balance billing, meaning if. I didn't mean to interrupt you, but I think you're going to the trial itself. I may be wrong about where Justice Van Tine was going, but. No, I was. I thought you were going to the summary judgment. No, the interim summary judgment. Was there a material issue of fact?  That's what we wanted to hear you talk to me about. What was that material issue if everybody's in agreement that all of these things were done or it transpired in a way? Yes, the material issue of fact was whether Medicaid, this was a Medicaid contract, or Medicaid claim. Second. Whether it was a Medicaid claim. So is that a question of law? Well. Coverage. Is that a question of law? Coverage is a factual issue. And plaintiff. Why is it not like a duck action, you know, where we're just trying to figure out coverage? I understand, Your Honor. It plaintiff took the position and the court, the trial court accepted that Medicaid had nothing to do with this case. So the court, I mean, pulled it extensively from the trial court statements from the bench that this is private. This is not private insurance. It is or it's not private insurance? That's what the court said at the hearing. So you're saying that the trial judge was wrong? Absolutely. Okay. Because the case was made clear in Midwest Emergency Associates versus Harmony when we cited the case extensively in a brief, which says that once you treat a Medicaid patient and you submit a bill to Medicaid, and Medicaid pays you X dollars, you cannot go back to the patient and say, pay me the rest. By agreeing to accept medical payments from the state, you agree in advance that that payment will be payment in full. That's what the opposition is so far as this is the controlling law in this case. My understanding, if I may, concerning the issues of fact, we argue in the motion for summary judgment and in the motion for reconsideration that the question was whether Lieberman filed timely the application to get in the queue for Medicaid benefits. Whether they filed timely or not, what does that have to do with whether Frank was eligible for coverage? Frank was eligible for coverage when he applied for coverage, and there were just two conditions for him getting benefits. And the first was to spend out, that he had to spend in terms of his assets. He had to basically impoverish himself, spend the money for medical care, and then there was a penalty. And once those two elements were met, then the Medicaid would pay. The application that we are saying they should have filed, they would have filed in January of 2015. They would have gotten a spot on the line, and they would get paid. The reason they only got paid $44,000, they would have Medicaid $154,000. But they got paid $44,000 because Medicaid took the position that the application was late. But they ultimately did receive the payment, though, for Medicaid. For $44,000. For $44,000.  And if I'm correct, then your position is that Frank or your client, I should say, satisfied whatever Medicaid spendout requirements were needed. Correct. Okay. And let me just simplify, because... Because it's your position, what he just said, because they owe nothing because Medicaid paid. Correct. Okay. Even though Lieberman was out, the balance between $157,000 and $40-something, your client is not eligible for it because Medicaid had already written this, which I actually covered. There are two components to plaintiff's claim. There is the component for which they billed Medicaid, the $154,000, and they got paid only $44,000. They are saying, we are responsible for the shortfall at their private rate pay, which is about $345 to $365 a day. The Medicaid rate is $156 to $178. So almost double the daily rate. Now, is Medicaid saying that the reason that there was a discrepancy in what they paid in terms of what Lieberman wanted was because of the late submission? Yes. Okay. And we have, as part of our efforts, we have an email from... A female, I read. Did you read it? Yeah, we read it. Yes. Yes. Email related. Yes. It was basically, because I think we're just... From just this discussion, Frank went in, his wife paid what she had to pay. She applied in 2014 for Medicaid. Yes. And within three months after that, Lieberman should have applied at, what do they call it, an admit pack. Yes. And then Mrs. Curzon, I think is the last name, fought them about this $200-something-thousand... Spendout. Spendout, and the $100,000 or so penalty, whatever it was. But she ultimately won everywhere. She won the spendout and she won the penalty down to zero. And Lieberman was informed of that. Yes. And they never had put the admit pack in early. They didn't put it in until 2017. Correct. And then in 2017... Let me just follow up with this, because we have a situation where Plaintiff files a motion for solemn judgment. They tell Judge Warnick that spendout has not been met, that there is a penalty, and if they file a claim with Medicaid, there will be criminal consequences. Then, in December of 2021, after the motion was granted for solemn judgment, December of 21, Mr. Kelly communicates with the department and basically says, Well, the penalty has been lifted, so maybe Mrs. Kurtz is right. We entitled her to the benefits. However, on January 4th, there is a motion for reconsideration. I don't understand. I'm wondering what the judge said when he got the information that they had... The judge was not told that. He wasn't told that? He didn't know about the Medicaid coverage at the time you rolled out the motion? He did not know that the Medicaid was basically that the obstacles to the payment were kind of lifted. Plaintiff's counsel failed to disclose to the judge on January 4th that the obstacles to getting payment from Medicaid were removed. I.e. coverage. I'm sorry? That is coverage. And that the coverage is available. So, basically, the judge did not hear him. It's hard for me to believe that nobody told the judge. I know that your client was pro se, and I probably shouldn't say this, but she did a pretty darn good job. She did not know that. Okay. So then maybe I'm misreading something, but I thought I read that it was disclosed prior to the motion for summary judgment. It was not. But Lieberman knew about it because they had gotten the notice. Yes. All right. You should know, but don't do that. I'm going to look at the record and see who's telling the truth anyway. Because this was communication between Lieberman and the state agency, and we were not in the email chain. All right. So I have a question. I'm going to ask the same question on Lieberman, but it appears in the record that the trial regarding the damages incorporated the entire time when your client's husband was in the facility. If they got paid in part, why was it running from the beginning to the end in terms of the damages? Because of damages. The judge felt that the jury would be confused with all the testimony about the different payors. So the judge felt that the way to get to a result would just take the number of days that he was there, multiply it times the private rate. Even though he wasn't entitled to the private rate the whole time. Yes. And then deduct the actual payments that were made. So as a consequence, we have a situation where plaintiff is violating the balance billing because it's getting the shortfall in the Medicare payments, and it's getting compensated for the period that they would have received payment had they submitted timely their application. Okay. It's worth telling is that, and I'm approaching my time limit, but it's worth telling is that between December of 2021 and May of 2022, there was no payments made by my clients to address any spend-down issues, and there were no further legal proceedings involving the penalty. So all of a sudden, we find out on the eve of trial that Medicare paid $44,000. And I raised that issue with the trial court at the paper conference on July 7th. And I said, that puts a different spin on the whole picture, because now we have a representation made to the court that Liberman could not file, and there would be penalties and consequences, and that Liberman would not get paid. And then we have a payment made, and I asked that the case be reopened to allow me discovery to find out about all the relevant facts. The court denied it, and we went to basically to an abbreviated trial, which is the number of days times the private pay minus the payments that are made. Okay. Is there anything else you'd like to add? Well, the only thing I would say, just call your Honor's attention to the 42 CFR paragraph 447.15. So what was that again? Which one? Sure. 42 CFR paragraph 447.15, which imposes a, as the case law says, a bright line rule. When a provider accepts Medicaid payments from services, this prevents the provider from billing anyone for the difference between their customary charges and the amounts paid. You basically, you're elected to deal with Medicaid, you're going to get paid on Medicaid, or you've got to accept the payment as payment in full for that. Okay. Thank you. We only have time for rebuttals. Yes, there is. Counsel? We let counsel go over it a little bit, so we'll extend the same courtesy to you as well. Thank you very much. Sure. Thank you. If I may, I'd like to pick up on your Justice's question about a brief factual summary. I'd like to clarify a little bit about the chronology here and just sort of add to what has been a very long, complicated process. Medicaid is a very confusing process. So, yes, Mr. Kurtz admitted to Lieberman in 2013. Mrs. Kurtz applied December 2014 for Medicaid. There were two denials, 2015-2016, all of which she had appealed timely and proceeded with the Department of Health Care and Family Services to resolve that issue. In 2017, we received our first nursing home supportive living facility calculation. This appears in the record in many places. This document is what is used to determine, okay, what is the determination by Medicaid to determine when you have met the resource limit, right? Medicaid is for low income. I just want to stop you for one second. Yes. When she applied for Medicaid in December of 2014, was Lieberman notified? Lieberman knew that she was applying. We actually helped her through the appeals, providing documentation and information to help sort through the denials and all of those things. So we were aware. And when you apply for Medicaid, so there's two kinds of Medicaid. There's long-term care Medicaid, and then there's community benefits Medicaid, hospitals, doctor's visits, pediatricians. So there's two different versions. When you apply for nursing home benefits, you have to identify the facility where you're living. So all of that is sort of part and parcel. So the argument is... Which one was she applying for? Long-term care nursing home. Okay. And that's why we get this nursing home calculation. Yeah, that's why I want to stop you. She applied in December of 2014. Lieberman is aware of that. Absolutely. Isn't Lieberman supposed to do their admit pack at that time? So it's complicated in that because there were denials, she wasn't in the system. And so to get to apply the admit pack, DHS knows that they're admitted, but in order to apply to do the admit pack, to say this person is admitted in my facility, we need that Medicaid number. And so there has never been any testimony in this case by DHS. I forgot to ask you a question. I said, was Lieberman supposed to apply the admit pack? No. No. All right. No. So then this nursing facility calculation on 2017 comes in, and that is when we have a $22,000, $266,000 spend-down and a penalty period. Again, timely appealed. Mrs. Kurtz does not believe that this is an appropriate calculation of her income and assets. And though it says that Mr. Kurtz is eligible, there needs to be the spend-down, then the penalty before the floodgates open and Medicaid benefits are available. As you know, that appeal carries on until 2021. All the while, Lieberman has received no payment for their care. This case begins. Well, they received something from Ms. Lieberman. They did. They received a partial payment, $6,200, some Part B Medicaid payments for therapies and things like that. From another payor. Medicare paid their 100 days. There was Medicare Part B for a couple ancillary therapies. Omaha neutral is in the record, and so is Blue Cross Blue Shield. Those payments were received. Those were paid at the beginning, right? Exactly. And those all cover periods of time. They're sort of scattered throughout. The therapies are scattered throughout. The Medicare is all predating the Medicaid application because Medicare is a payor. In your position, you're not paid as of when? What year are you not being paid? 2014. 2014? Correct. And so then those appeals of the 2017 Medicaid decision proceed. In 2021, DHS dismisses its penalty period case, as Your Honor correctly noted. When they did that, they recalculated the benefits. Lieberman became aware of the dismissal. We were not a party to that case. Because a dismissal order was attached in the briefs to the motion to reconsider. That's how we knew it. We knew that this case suddenly disappeared. We then reached out, asked for more information. In January 26, 2022. So they wouldn't have notified you? I mean. So DHS does not notify you. It's making the submission. When they make the submission, in order for you to be able to keep track of what's going on, wouldn't they have notified you as well? So for better or for worse, this complicated case that went on for 10 years, Mr. Kurtz had been passed away three years. So he's no longer in our facility. So all of the notices got sent to Mrs. Kurtz. We are no longer part of the. When did he discharge? 2018. Well, he discharged from our facility June 23, 2018. Subsequently passed after that. So he's been out of our facility now for four years. So we are not getting notices in due course. There is no evidence or testimony in the record about any procedure that DHS has when someone passes and there's appeals and that sort of thing. Yeah, I still have another question. When the motion to reconsider is filed, you do have these documents now. So we know that the case was dismissed. The new nursing home calculation was not issued until January 26, 2022, after the motion to reconsider. So we don't know. Though we know the penalty period was removed. We didn't know that they recalculated the spend down. Now, getting to the spend down. By who are you referring to? Medicaid. Medicaid. And Medicaid, by removing the penalty, reassessing the income, looking at all of those medical receipts that Mr. Zelikowski talked about, they made the calculation that there was $408,637 available to apply towards the cost of the care at the facility you are living. So that means effective December 2014, you have to start paying $408,000 to Lieberman until that gets exhausted, until you spend it down. We go into the system. According to the Medicaid system, they calculate that that was effective April 2017. We submit claims and we receive $42,000 for the period, the dates of service from April 2017 until his discharge in December 2018. In the record, the testimony during the trial is no payment is owed for April 2017 to June 2018. So the balance billing issue was not an issue. Lieberman accepted full and final payment, albeit there was a co-pay assigned to the Kurtz family during that period. But during the course of the trial, the jury was instructed or they heard evidence from the CFO that Lieberman is not to pursue payment from April 2017 to 2018. No payment is owed for that period. That was the testimony. What about the confusion aspect that counsel mentioned, that Judge Warnick didn't want to return it? Our perspective is, based on this $408,000 spend down that began December 2014 and continued until Medicaid determined it was in met status as of April 2017, they were required to pay the facility. We received no payment for that determination. That is a private payment on the calculation at $10,500 a month, and that is where we presented evidence and testimony that for his admission, absent the amount that we asked the jury to deduct for all the payments that were received, we are entitled to payment under a theory of quantum merit, unjust enrichment, because we had to dismiss the contact action because there was a dispute about whether there was capacity to execute the contract for the services that were received over the course of five years. So it's actually a very simple calculation. From that period of time, there's a private pay rate, and jury, what do you think are the valuable, what is the value of those services? And they heard testimony about the different rates. They heard testimony about the fact that there's 438 days for which payment is not being requested, and they came to a judgment. I'd like to, because we're going on and on about the trial, I want to go back to the motion for summary. Sure. Absolutely. All right. So tell me what happened at the motion for summary judgment. What was the basis of the judges' ruling that there was no material question of fact to be resolved by the jury? What was the issue, and what did the judge decide? Because I'm confused as to why there was a grant of summary judgment in the first place. Absolutely. And so as you can tell from the record, there has always been a claim by the defendant appellant that Medicaid should pay. Medicaid should pay for everything, that all of the determinations were wrong, they met the income limits, and they should owe nothing. Throughout the course of the discovery, from the time this case was instituted in 2016 to 2021, multiple forms of discovery, depositions of Department of Health Care and Family Services, and at no time, and the transcript of the motion to reconsider is the most telling, was there ever any evidence, any testimony, any document that would show that some of these arguments are supported and that there's evidence to establish them? And I just want to stop you. Yeah. And it is a long and complicated record. Absolutely. But I thought attached to one of your pleadings, there was testimony from two different people from DHS, and in that testimony, DHS or the other entity indicated that the spin down and the penalty had been resolved. I thought that was in your documents that you presented, and so that's exactly the opposite of what you are saying. So how could the judge make that determination as to who was telling the truth when that's a question for the Trier Act? And thank you for asking that question, because how Medicaid determines someone is in met status for their spin down is they calculate the income. No, I heard that. They do it by time. Right. That you gave to the judge to review. Is that in the material that you gave to the judge to review? No. We have never represented that they made their spin down. In no attachments? No. In no attachments. Did you get, there was nothing in your attachments from anyone saying that there had been a disposition, that they had made their spin down, and that I think that the penalty had gone to zero? No. Okay. So the department does not verify whether an individual pays their spin down. The documents and the testimony is clear that they leave that to the provider to go out and get it, which is what I'm here for. And so what they do is they calculate the time and determine when, and it's in the deposition of Mr. Haynes, it's a theoretical calculation as to when met status will be achieved. In this case, based on the final determination, met status was April 2017. And so we never received that spin down. DHS says, well, then you go figure it out. And that's why we're here. So those payments were not made. So the terminology is confusing because there were determinations during all of the administrative litigation and things where an administrative law judge said, well, it appears that you will have been in met status. And that was taken by the appellants, and agreeably, it's confusing communication that they were in met status. Well, what that means is that's based on the assumption that the payments that were directed in these documents were being made to the facility. They weren't. And so the question that we wanted to ask the jury, the trial court, is what are we owed for that period of time for which this money that Medicaid said you are not eligible for the benefit, floodgates to be opened, during that time before the floodgates opened, that we are entitled to for the care and services that we provided to Frank Hertz from his admission in 2013 all the way up to April 2017 before we started to receive that Medicaid payment? Wouldn't that question have been easier posed to Medicaid and just say, okay, you gave us a check for X amount, but we're due this Y, are we only getting a certain amount? So in terms of what was billed for $152,000 and the $42,000, we're not disputing that. That's the Medicaid payment that we will accept. We will not balance bill. That is our state obligation. It's that period from before April 20, so March 2017 to December 1, 2014, when the eligibility, when Medicaid said you have $408,000 to pay, you, Hertz family, have $408,000 to pay to the facility you are living. And that's on the first page of that document. We have to go out and get that money. The Department of Health Care and Family Services. Yes. Okay. And it makes sense. Medicaid doesn't have the resources or the availability to be chasing down people and getting receipts for every monthly payment they make to long-term care facilities. They expect this to be paid, and they're going to let the facilities go out and get it. And as ‑‑ Do you have any case law that you can cite to where this scenario happened? Unfortunately not. Because I do think that would have helped us forestall and get through this piece of the puzzle. Is there anything in the regs that says this? So there are regs. It's in the Administrative Code 89, Ill Admin Code, I believe it's 146, is the Public Aid Code. No, that's the Supportive Living Code. It's 105, I believe. It's the ‑‑ sorry. But it's in the Illinois Public Aid Code. And there are different sections, and we did cite to them in our brief as to talking a little bit about that. But in terms of addressing this particular situation where you have substantial spend down, a penalty, a penalty that gets disputed, a penalty that just gets withdrawn, there's no reg that directly addresses that, particularly in overtime. I have a question. Absolutely. I'm back to the very beginning of this. Because that's where, I mean, in my opinion, I'm having the most difficulty with this. When Mrs. Kurtz applied for Medicaid in December of 2014, what is Lieberman's responsibility at that time? You said she does not have ‑‑ or they don't have to apply for the admit pack, and then later on they get this TAN number. What do you have to do once you are notified that she has applied for Medicaid in December of 2014, other than just sit on your hands until everything is resolved? So at the point when you are going to be billing Medicaid, you do need to submit that. No, I'm saying what do you have ‑‑ I'm not. What do you have to do, if anything ‑‑ well, I'll step back a moment. When she applies in December of 2014, is Lieberman notified that she's applied? In this case I was not involved. Typically the facilities actually help with the application process. Okay. Then once the application is in in December of 2014, what, if anything at all, is your ‑‑ and I don't mean you, of course. Is Lieberman's responsibility to get in line for possible payment if she's approved? So you do have to, once you are made aware of the information, and so if, depending on what you receive, you do go into the MEDI system. Go into the MEDI system, enter in the data that, if it isn't in there already, that shows, because it is in the application where they are living when they admitted what the benefits are for. Because when you apply for Medicaid, you are allowed to apply retroactive three months. So, for example, as many of us have experienced, someone suddenly goes into a nursing home. After a fall, they need rehab. It takes a while to get all the documents, to get the application. So the process allows you to retroactively apply for three months. Right, so she applied in December. Correct. I know it would have gone back to September. My issue is still, once, you can't tell me first when you're notified. It varies by case, and by how forthcoming families are with information. If they receive everything themselves, if the facility is included in the service information. Is there anything in the record that shows when Lieberman was notified initially, after she applied in 2014? No, and in fact, we talked to Mr. Haynes about this. About who? Mr. Haynes, he was one of the DHS representatives that we deposed about spend-down penalty periods notifications. And I specifically asked the question, how would Lieberman Center know when they could begin billing Medicaid for Mr. Kurtz's nursing home charges with the revised penalty? And his response was answer line 13. That's a different question. There would be no notice. That's a different, that has absolutely nothing to do with what I just asked. I'm talking about at the very beginning, when she applied for her husband in December of 2014. Is there anything in the record that says you have the notification? And so there, for you are supposed to start creating this admit pack, so you can get in line for possible payment in the future. No, there's no notice that tells you to do that. You're telling me from December of 2014 until 2017, you got no notice? Well, there was an admit pack that was filed, but over the course of appeals and I know that. When was the admit pack filed? I don't have a date on. What we did is during these depositions, we had someone who was testifying by Zoom, because it was during COVID. And he went in and he said, I see an admit pack here, but it just, it's a data screen and he said he saw one. Is there a date on it? And to be honest, though, I think the admit pack issue is a red herring. We're not asking what you think. Was there a date on the admit pack? No, not that I have in my record. But when benefits became effective in April 2017, we billed those and we got paid for those. There is nothing in the record that says that whether it admit, even if I were to admit or agree that an admit pack was not timely filed, there is nothing in the record that says that that failure to submit the admit pack resulted in nonpayment. We have no evidence, testimony, or document that says that failure to timely file caused nonpayment. And I feel like that link is important. I thought there was something, and maybe I'm wrong. I thought there was an email from after you applied that said you applied for this longer period, but because you put the admit pack in, for, I don't know. That it was basically late, that you couldn't go, you could only go, I can't remember what the language is. But it gave, it put the issue that it was your mistake. And I do recall an email, and I hope it is the same one we're thinking of, but that was by the assistant attorney general who is representing the witnesses who would have been called to trial depending on the outcome of the motions. Okay. I'm aware of that one where she said it looks like it should, but I would say the assistant attorney general doesn't work in Medicaid, doesn't work on the documents, and any representation by assistant attorney general Boulay. I thought it was from somebody from DHS. We will check. Of course. What is your position as to when Medicaid eligibility became relevant in this case? The liability phase or the damages phase? Damages phase. Why not at the liability phase? Well, at the liability phase in that there is that period of time in which from December 2014 to April 2017, that though the Medicaid application has been processed, has been deemed appropriate, you have to spend down your application. You have to spend down your assets to become qualified for low income status, at which point you're required to pay the facility. After that period expires, then Medicaid becomes effective. During that period of time, you're a private pay resident. Though we are waiting for the Medicaid benefits to take effect, you're paying the private pay rate. You're subject to the requirements, the billing, the invoices, as a private pay resident. And for that reason, the Medicaid issue, though it is part of the person's profile, it is not active. It is not relevant for the invoicing, the billing, and the collections, which is why we believe it's fair at that point to ask a jury to calculate the reasonable value of services where the appellant argued there is no basis in contract for the services you provided. We are entitled to some payment for 24-7 nursing services. So as the damages phase, though, it appears that Lieberman filed a number of motions to try to keep Medicaid eligibility out. Yes, we filed those motions in Lemonade to remove the aspect of Medicaid, because at that point, it's a simple calculation. No, it's not. If it's a simple calculation, then it would just be simple math, right? Like, why do you need a jury? You just do the math. And I believe there could have been a decision on damages at the motion for summary judgment phase. The judge decided to hold that issue of damages to the jury, and we proceeded. But for the period of time for which the testimony was elicited, December 21, 2014, to April 17, 2017, it is not relevant. It is the private pay rate and what the reasonable value would be. From 2017 on, we accepted the Medicaid payment as full payment, and we didn't pursue the copayment necessarily. We just left that out of it, excluded that Medicaid payment from the calculation and the draft. I didn't interrupt, but so how does this eligibility or lack of eligibility in the damages phase clarify for the jury? I don't think the jury needed to know anything about Medicaid for determining what is the benefit service. Isn't that part of the damages? You're trying to assess, we're owed X number of dollars, and if they bring in evidence about, well, yeah, but you were getting paid by Medicaid, then you have to put that into the equation. That's where at least the other sides would argue. But that's where the offset came in, where that was deducted from the payment. What we asked the jury was the reasonable value of services based on the evidence that was presented. Multiple rates were presented, including the Medicaid rate. The dates of service were presented as evidence, and specifically, our CFO testified that we were not pursuing dates for April 17 until the end, which is 400 and something odd dates. So we gave the jury the opportunity to determine what is the value of services for what we're requesting we are entitled to payment for. From there, after that verdict, we allowed the set-off, reduced the Medicaid, reduced the payments from other insurance. Mrs. Kurtz's payments were included in the jury verdict. They offset based on that. They were aware that she had made payments. And we do believe that removes the basis for any reason to add all of this Medicaid information in there for which there was no evidence to support the claim that SpendDown had been met based on receipts, for the claim that this TAN hadn't had much of a difference. I mean, it seems like this was taken away from them, and they're asked to make an assessment in terms of damages, yet at the same time, there might have been something else that could have been introduced to say, yes, but. But at the close of discovery, there was nothing. And that's what the trial judge did. He reviewed everything. In the motion for summary judgment, all of this was presented. The appellant was able to present everything they had, everything they planned to offer in terms of Medicaid at the trial. And the trial judge correctly determined there is simply nothing admissible here. It is all he had a statement in the motion for reconsideration that is all taken out of context. It is snippets. It is pieces of documentation with no foundation for which would not come in front of a jury anyway. And he was correct in that regard, in that proceeding to a trial and presenting information to a jury without foundation, without admissibility, all it would do is confuse the jury, because so much of it wouldn't come in in the first place. Anybody else have questions? I'm not, no. Thank you very much for your time. All right. Thank you. Counsel? Yes. Yes, let me first address the question to the judge. How can you, Justice, you raised the question. There is an e-mail dated January 25, 2022 from Antonia Pasquini to Alan Garcia, who is a billing clerk at Littman. I'm sorry. And it says the eligibility for this customer begins on September 1, 2014, as the application date was December 30, 2014, three months back. While the customer did have eligibility, the admin for him was late. The TAN was submitted on March 13, with the admin requested date of April 3, 2014. So basically, it's continuing on, and then the e-mail closes with the following. The only way around this, if there was an early TAN that was submitted, that was within the 45-day time frame. So the department made very clear that the admin, the TAN application should have been filed within 45 days of the application. Okay? So that's the e-mail that you want to recall. Now, one of the fundamental misleading statements in this case is that the spend-down can only be met by the curses of paying dividends. We know it's, yeah, I'm sorry, I didn't mean to say we know that. Like, I didn't mean to dismiss, I'm just saying don't waste your time. We know that it could be other bills. I'll move on. Thank you. Then, counsel for Littman also talked about the spend-down, the 440-something, this is all, some fictitious documents. Unneeded fictitious documents. Those documents didn't come into play, and certainly my client did not pay 440, whatever the figure was, in order to meet the spend-down requirement, and he had to cut pay. So the best proof that the spend-down was met was the fact that the Medicaid paid. And the only hang-up to that was the penalty, and that penalty was removed by Judge Hall, by the court order. So all the impediments to payment by Medicare were gone. And the trial court was not made aware, in the motion for reconsideration, was not made aware that this, all these issues were already resolved, and the court's basic premise, or the representation to the court, was that Medicare would never get paid, it would face criminal sanctions. That was just a hyperbole, it was something that was not real. That was not told to the judge. And then we had pre-trial conferences with the court in February and in March, and nothing is being told. I think the duty of candor to the tribunal would dictate that you advise the court of a material fact. I'm looking at just a little timesheet that I wrote, and that's why I asked counsel, when did they know? And the email has the date of January of 2022, but in July of 2022, they're still representing to the court that there's no pay-down, that there is still a penalty. During the pre-trial conferences, was your client still pro se? Yes, and I came in in March of 22, and I believe I was present at the first pre-trial, at the trial setting. By that time, the trial was set, and the court already ruled as to what the issue was going to be at the trial. So on July, in July 7, I believe, it's in the transcript, we were made aware that the payment of $44,000 was received, and then I raised the issue with the court that this obviously bears materially on the underlying facts of the case, and I thought that it would be unfair to go to trial with basically pretending that that didn't happen. And the court denied my request. And obviously, as you know, there were a whole series of motions anonymously to bar any discussion of Medicaid, and certainly the court, right from the get-go, felt that this is not, that this case had nothing to do with Medicaid, even though Medicaid was front and center in this case. Yes. Any other questions? I don't have any. Oh, yes, one more. One of your judges, justices, asked when was the ban, when was the ban, when should it have been filed. I asked when should the admit Admit the file. Which would have been a placeholder. Exactly. Yes. Exactly. And there was nothing Until 2017. No, that's when it was filed. But there was nothing preventing the immigrant from filing it sooner. And certainly if they had filed, we wouldn't be standing here because they would have gotten paid for all the relevant period. And that was the issue of the affirmative defenses. And certainly I asked that we be permitted to argue a mitigation of damages or affordable consequences of the trial, and the court denied that. If you have any more questions, I'll sit down. Thank you. Thank you. Thank you very much. I want to thank both counsels for a well-argued matter and a very interesting case. The court will take it under advisement. Thank you. And we are adjourned.